John H. Mathieu and Elizabeth A. Mathieu v. Commissioner.
John H. Mathieu & Elizabeth A. Mathieu v. Commissioner
Docket Nos. 29455, 29456.
United States Tax Court
1952 Tax Ct. Memo LEXIS 136; 11 T.C.M. (CCH) 751; T.C.M. (RIA) 52226; July 14, 1952
*136 On August 4, 1944, Emma Mathieu, mother of John, endorsed, in blank, certificates for 276 shares of stock to facilitate the sale of Mathieu & Sons Foundry Company. On August 18, 1944, Emma died testate prior to the sale of the stock. After Emma's death John's brother claimed the stock had been given equally to him and John, which John denied. Held, there was no gift of the stock, and it belonged to Emma at the date of her death. Emma's will divided her property equally between her two living sons, John and Nicholas, and the children of her two deceased sons. Held, the basis for determining gain or loss on the subsequent sale of stock inherited from Emma was the fair market value of the stock at the date of Emma's death. A family dispute over ownership of Emma's Foundry stock was settled by an agreement to transfer the 276 shares to the corporation as treasury stock. The executor, Nicholas, transferred 252 shares as agreed, but reissued 12 shares to himself and 12 to John. Upon the sale of Foundry, the proceeds were distributed in accordance with the outstanding stock. Held, the amount of gain realized by John on his original stock, the 12 shares, and the shares inherited from *137 his mother determined; held, further, Elizabeth's gain does not include the gain realized by her children on Foundry stock inherited from their grandmother. Robert W. Roe, Esq., for the petitioners. John L. King, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax against the petitioners as follows: John H. Mathieu, $57.50 and $1,708.51 for 1944 and 1945, respectively; Elizabeth A. Mathieu, $1,790.14 for 1945. John H. Mathieu and Elizabeth A. Mathieu claim overpayments for 1945 in the respective amounts of $5,160.17 and $3,174.80. John H. Mathieu *138 concedes the deficiency determined for 1944. The issues are the same in both cases as to the taxable year 1945, namely, (1) whether Emma Mathieu, mother of John and mother-in-law of Elizabeth Mathieu, owned 276 shares of stock of Mathieu & Sons Foundry Company at the date of her death on August 18, 1944; (2) if so, whether the fair market value of such shares was $88,333.33 as claimed by the petitioners, or $80,040 as determined by the respondent; and (3) the amount of gain realized by each petitioner from the sale of stock of Mathieu & Sons Foundry Company in 1945. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. Petitioner, John H. Mathieu (hereinafter referred to as John) resides near Stevensville, Michigan. Petitioner, Elizabeth A. Mathieu (hereinafter referred to as Elizabeth) resides in Bridgman, Michigan. Their individual income tax returns for the taxable year 1945 were filed with the collector of internal revenue at Detroit, Michigan. Mathieu & Sons Foundry Company (hereinafter called Foundry) was incorporated in 1917, under the laws of the State of Michigan, by William R. and Emma Mathieu and their *139 four sons, Nicholas, John, Joseph, and Adolph. Each incorporator subscribed and purchased one-sixth of the original capital stock of Foundry. During 1938, Elizabeth inherited from her husband, Adolph Mathieu, 138 shares of the common capital stock of Foundry. The fair market value of these 138 shares at the date of Adolph's death, and the basis to Elizabeth for computing gain upon the sale of such shares in 1945, were $21,500. On August 3, 1944, the entire capital stock of Foundry consisted of 828 common shares owned as follows: Number of Shares; and
Shareholder
Relationship
Fraction of Total
Emma Mathieu
Mother
276 Shares 1/3
Nicholas Mathieu
Son of Emma
138 Shares 1/6
John Mathieu
Son of Emma
138 Shares 1/6
Elizabeth Mathieu
Widow of Emma's deceased son, Adolph
138 Shares 1/6
Irene Mathieu
Widow of Emma's deceased son, Joseph
138 Shares 1/6
Total
828 Shares 1
Emma, Nicholas, and Irene Mathieu will hereinafter be referred to by their first names. The basis in the hands of Emma of her 276 shares of Foundry stock was $33,000. Such stock was evidenced by stock certificates numberd 30 and 35 in the amounts of 148 and 128 shares, respectively. *140 The cost to John of his 138 shares of Foundry stock, and his basis for computing gain upon their sale in 1945, were $6,576.57. On August 4, 1944, Emma, who was 79 years of age, was ill. At that time negotiations were in progress for the sale of the capital stock of Foundry to the Lakey Foundry Company. Nicholas visited his mother on or about that date and secured her endorsement of her stock certificates, in blank, so that her illness would not hold up the sale. The endorsed certificates, numbered 30 and 35, were delivered to and retained by Nicholas. The negotiations for the sale of the capital stock of Foundry to Lakey Foundry Company were not consummated. On August 18, 1944, Emma died testate. By her will Emma devised and bequeathed all of her property in equal one-fourth shares to her sons, Nicholas and John, and to the then living children of her deceased sons, Adolph and Joseph, per stirpes. [1] Nicholas was named executor of the will which was duly admitted to probate and administered by Nicholas. *141 Nicholas, as executor of Emma's estate, did not inventory the 276 shares of Foundry capital stock as being a part of Emma's estate. His inventory of the assets in Emma's estate, filed with the Probate Court of Berrien County, Michigan, on or about October 16, 1944, itemized personal property aggregating $18,325.88 and real property in the amount of $8,500. The inheritance tax due the State of Michigan was determined originally to be $54.10 without including the 276 shares as having been inherited or as gifts made in contemplation of death. At some time after the death of Emma, Nicholas caused to be typed in the blanks above Emma's signature on stock certificates numbered 30 and 35, the names "John H. & Nicholas F. Mathieu," as transferees, the name "Nicholas F. Mathieu," as transfer agent, and the date as "August 4, 1944." In December, 1944, Craig Mathieu, son of Irene, having received no notice that he was a beneficiary under his grandmother's will, secured a copy of Emma's will and the inventory of the assets of her estate. Noting that the inventory did not list Emma's capital stock in Foundry, Craig asked Nicholas what had happened to his grandmother's stock, and was informed *142 by Nicholas that Emma had given her stock to him and his brother, John. Craig then called on John at his place of business and asked him if it was true that Emma's stock had been given to him and Nicholas. John denied all knowledge of the gift, and rejected the gift if one had been made. John did not think his mother would make such a gift without telling him about it, as he had seen her almost daily in the hospital during the last three or four months of her illness. After talking with John, Craig consulted an attorney. Two or three days later at a meeting in Foundry's office, attended by Nicholas, John, Elizabeth, Irene, and Craig, the latter again pressed Nicholas about Emma's Foundry stock. John, in the presence of Nicholas and the others, denied any knowledge of the gift and stated that he would not accept it. Nicholas maintained that the Foundry stock was still under his dominion and control, but that he did not want any trouble and would consult with Foundry's business advisor, W. B. Scott, to see what could be done about it. On or about December 6, 1944, the same parties, and W. B. Scott, held a further meeting on the matter of Emma's 276 shares of Foundry stock. It was *143 agreed at this meeting that the 276 shares would be transferred to Foundry as treasury stock. The participants recognized that this arrangement was not in accord with Emma's will, but both Elizabeth and Irene agreed that they would see that their own children received the one-fourth share to which they were entitled under Emma's will. On the day following the last-mentioned meeting, Nicholas called Craig into the office and showed him a stock certificate which had a notation on the back thereof stating that the shares had been transferred to treasury stock. On the back of stock certificate number 30 appeared the following notation: "Rec. into and as Treasury Stock of the Company the within 148 shares as above." Craig was not shown that other stock certificate. On the back of the stock certificate number 35 appeared the following notation: "Rec. the above 128 shares for redistribution as follows: '104 shares into Treasury Stock of the Company; 12 shares to John H. Mathieu; and 12 shares to Nicholas F. Mathieu.'" There were no signatures, initials, or dates beside either of such notations. Under date of December 6, 1944, Foundry issued stock certificates numbered 42, 43, 44, and *144 45, in place of certificates numbered 30 and 35, for shares of stock in the respective amounts of 148 shares, 104 shares, 12 shares, and 12 shares. Stock certificates numbered 42 and 43 were issued in the name of Foundry; stock certificates numbered 44 and 45 were issued to John and Nicholas, respectively. The issuance of certificates numbered 44 and 45 was without the knowledge or consent of John and violated the family agreement that certificates numbered 30 and 35 would be transferred to Foundry as treasury stock. Nicholas executed each of the stock certificates numbered 42 to 45, inclusive, as president of Foundry. John first learned of the existence of certificate number 44 when the purchaser settled for the purchase of all the capital stock of Foundry, as hereinafter set forth. The ledger books of Foundry disclose the outstanding stock on August 3, 1944, to be 828 shares, and no entry was made therein to reflect the acquisition of any treasury stock subsequent to such date. The stockrecord book of Foundry does reflect the acquisition of treasury stock subsequent to such date. On July 30, 1945, the entire outstanding capital stock of Foundry, being at that time 576 shares *145 (828-252), was sold to Walter Steere and Associates for the sum of $265,000. The proceeds of the sale were distributed as follows: Basis of
Shareholder
Proceeds
Distribution
Nicholas
$ 69,010.63
150 shares
John
69,010.63
150 shares
Elizabeth
63,489.37
138 shares
Irene
63,489.37
138 shares
Total
$265,000.00
576 shares The expenses of the sale charged to and paid by John and Elizabeth were $194.65 and $40.39, respectively. On their income tax returns for 1945, petitioners reported long-term capital gains from their sale of Foundry stock as follows: Amount
Gross Sales
Taken Into
Price
Cost
Expense
Gain
Account
John
$69,010.63
$13,500
$55,510.63
$27,755.32
Elizabeth
63,489.37
27,600 $290
35,599.37
17,799.69
Nicholas, as executor, made conflicting statements to the Michigan and Federal taxing authorities regarding the assets in Emma's estate. He included the 276 shares of Foundry stock in the Federal estate tax return, filed with the collector on October 28, 1946, as transfers made by decedent during her lifetime, namely, on or about August 1, 1944, as follows: 12 shares to *146 Nicholas; 12 shares to John; and 252 shares to Foundry "to be held as treasury stock." For Federal estate tax purposes, the stock was valued at $236.66 per share, or a total value of $65,318.16 for the 276 shares. Subsequently, the respondent and the executor, as a result of conferences, fixed the value of the 276 shares for Federal estate tax purposes at $80,040. On or about October 9, 1947, the Michigan taxing authorities increased the inheritance tax liability of Emma's estate from $54.10, as originally determined in October, 1944, to $7,997.06. In redetermining the inheritance tax liability of Emma's estate, the Michigan taxing authorities valued the 276 shares transferred at $80,040, or $290 per share, i.e., 252 shares of Foundry stock valued at $73,080, transferred to Foundry to be held as treatsury stock, and 24 shares, valued at $6,960, divided equally between Nicholas and John. The Michigan taxing authorities made their redetermination "after reconcilment [reconcilment] of Federal Est. Return with adjustments, * * *." On or about October 24, 1947, Nicholas, as executor and legatee, filed a Notice of and Reasons for Appeal from this redetermination with the Probate Court. *147 Such notice reads in part as follows: * * *
"The inclusion of the transfer on or about August 1, 1944, of 252 shares of Mathieu & Sons Foundry Co. stock by Emma Mathieu in said order determining inheritance tax upon transfers in said estate, entered October 9, 1947, was improper and should be deleted from said order for the reason that said transfer was made prior to the date of death of Emma Mathieu and was in fact not made in contemplation of her death. * * *
"The transfer of 252 shares of Mathieu & Sons Foundry Co. stock determined in said order entered October 9, 1947, to be from Emma Mathieu to Mathieu & Sons Foundry Co. was in fact not made to Mathieu & Sons Foundry Co. but was made from Emma Mathieu to Nicholas F. Mathieu and John Mathieu, sons of Emma Mathieu, and, * * *." In a petition for redetermination of inheritance tax, filed on or about March 18, 1950, with the Probate Court, Nicholas stated that at the time the order redetermining the inheritance tax due to the State of Michigan was entered, no copy of the Federal estate tax return was on file with the Probate Court, and that the Probate Court's order was based on the recital contained in Schedule G *148 of the Federal estate return regarding the transfer of 252 shares of stock to Foundry as treasury stock. He recited further that the taxing authorities and the executor had agreed to withdrawal of the appeal and the filing of the petition for redetermination of the inheritance tax in the Probate Court. Nicholas then alleged that in fact the 252 shares "were at no time transferred to Mathieu & Sons Foundry Co. as treasury stock," and that the shares "were endorsed in blank by the Deceased approximately two years prior to her death and delivered to your Petitioner; that your Petitioner retained said certificates without notifying any of the heirs, devisees or legatees of the deceased until several months after Deceased's death, at which time your Petitioner disclosed that he held said certificates and that they were endorsed in blank by said Deceased; that by agreement of all of the heirs, devisees and legatees of said Deceased the names of Nicholas F. Mathieu and John F. Mathieu were inserted on the back of said certificates as assignees thereof, and upon the sale of said Mathieu & Sons Foundry Co. in 1945 said certificates were delivered to the purchaser of said company and the proceeds *149 from said sale divided among the heirs, devisees and legatees of said Deceased according to the terms of the Last Will of said Deceased on file in this Court; and that said heirs, devisees and legatees considered said 252 shares to be a part of the Estate of said Deceased and divided the proceeds received from the sale of said shares accordingly." On May 1, 1950, the inheritance tax from Emma's estate was redetermined by the Probate Court to be $1,265. In its determination the Michigan Probate Court treated the 252 shares as passing under Emma's will and valued such shares at $73,080, and it valued the 12 shares of stock transferred to Nicholas at $3,480 and the 12 shares transferred to John at the same amount. This determination was made as a result of Nicholas' petition which stated that a compromise of the claim owed to the Department of Taxation of Michigan had been effected and requested an order of the Probate Court to rule in accordance with this compromise. The Probate Court had ruled in its redetermination of October 9, 1947, that Emma had made a gift of the shares in contemplation of death. Nicholas died on October 30, 1950. Irene died on May 31, 1951. In determining *150 the deficiencies for 1945, respondent increased the net capital gain reported by John by $2,647 based upon the following computation: Sales Price
$69,010.63
Less: Expense of Sale: Attorney fees and recording
$151.50
Escrow charges and stamps
43.15
194.65
$68,815.98
Cost basis, 138 shares
$ 6,576.57
12 shares received by gift from taxpayer's mother
at $119.56521 per share
1,434.78
Total Cost Basis
8,011.35
Gain Realized
$60,804.63
Taxable at 50% - section 117
$30,402.32
In determining the deficiency for 1945 as to Elizabeth, respondent increased the gain reported by $3,174.80, based on her selling price of $63,489.37, less expenses of sale, $40.39, less the basis of the 138 shares inherited from her husband, $21,500, which resulted in a gain realized of $41,948.98, of which 50 per cent is taxable under section 117, or $20,974.49. At the date of her death, Emma owned 276 shares of the common capital stock of Foundry. The fair market value of Emma's 276 shares of Foundry stock at the date of her death was $80,040, or $290 per share. The amount of gain realized by John upon the sale of his Foundry stock in 1945 was $40,489.41. *151 The amount of gain realized by Elizabeth upon the sale of her Foundry stock in 1945 was $22,061.99. Opinion RICE, Judge: In order to determine the amount of gain realized by petitioners from the sale of their Foundry stock, it is necessary to decide two preliminary questions. The first of these is whether Emma owned 276 shares of Foundry stock when she died, or had disposed of such shares two weeks prior to her death. If Emma owned the stock on August 18, 1944, the date of her death, the stock passed in accordance with the provisions of her will. But if Emma disposed of the stock, or any part of it, on August 4, 1944, then the stock disposed of could not have passed under her will. It is necessary to determine the manner in which the stock passed for the reason that the basis of such stock in the hands of a donee is different from the basis of such stock in the hands of a legatee or devisee. Compare the provisions of section 113 (a) (2) of the Code with the provisions of section 113 (a) (5). Respondent contends that Emma's shares of stock passed by gifts inter vivos and not under Emma's will. He relies upon the oral and sworn statements made by Nicholas, the fact that John *152 received the proceeds of 12 shares allegedly a part of the gift, and a mathematical analysis of the method used in distributing the proceeds from the sale of the Foundry stock. Petitioners contend that Emma's stock passed by her will. They assert that when Emma signed her stock certificates in blank, as requested by Nicholas, she made no gift. Her sole purpose in signing the certificates, according to petitioners, was to enable the entire Foundry stock to be transferred to a prospective purchaser. Emma died before the stock was sold, and petitioners contend that her death terminated any authority that Nicholas had. Petitioners take the position that the stock was Emma's at the time of her death, became a part of the assets of her estate, and was subject to the provisions of her will. The evidence of what transpired between Emma and Nicholas on or about August 4, 1944, is largely circumstantial and second hand. Emma and Nicholas died prior to the hearing herein, and the principal testimony we have was given by Craig about what Nicholas told him of the meeting at which Emma signed over the certificates. The circumstances which prompted Nicholas' request support petitioners' position. *153 Early in August, 1944, Lakey Foundry Company was negotiating for the purchase of Foundry's entire capital stock. At that time, Emma was 79 years of age and ill. Craig testified that Nicholas told him that he had been down to see his mother and "had her sign her stock, because the next day they were going to have a meeting with this Lakey Foundry Company, and being she was ill, he didn't want anything to hold up the sale of it." It is undisputed that Emma died about two weeks after she signed the certificates in blank and that the negotiations with Lakey Foundry Company were never consummated. The inference that we draw from these facts and circumstances is that Emma made no gift of her stock to Nicholas and John prior to her death. She executed the assignment on the back of the stock certificates, in blank, in order to facilitate the sales' negotiations then in progress. She did not intend to nor did she make a gift of her stock to her surviving sons to the exclusion of the children of her deceased sons. Subsequent events, such as typing in the names of John and Nicholas on the back of the stock certificates, the various positions Nicholas took before the Michigan taxing authorities *154 and in the Federal estate tax return, John's specific denials that a gift was made, Emma's failure to tell John of the gift, and the equal treatment otherwise given her sons and the children of her deceased sons corroborate our conclusion that Emma did not intend to make a gift of her stock, and that such stock passed pursuant to the provisions of her will. The second of the two preliminary questions is the basis at Emma's death of the 276 shares of stock. Respondent contends that the basis is the fair market value of the stock as determined for Federal estate tax purposes, which was $80,040, or $290 per share. Petitioners agree that the basis is the fair market value of the stock, but contend that the selling price is the best evidence of the value of the stock since it occurred within about 11 months of the date of Emma's death. Since Emma owned one-third of Foundry's capital stock, petitioners argue that one-third of the selling price, $88,333.33, is the fair market value at the date of death. We agree with the parties that the basis of the stock inherited from Emma was the fair market value of such stock at her death. Section 113 (a) (5) of the Code. The evidence of fair market *155 value consists principally of the valuation for state inheritance tax purposes and for Federal estate tax purposes as opposed to the selling price of the stock approximately 11 months after Emma's death. In weighing and considering the selling price on July 30, 1945, as evidence of the fair market value of the stock on August 18, 1944, it must be remembered that the stock was closely held, the purchaser acquired the entire outstanding capital stock, and there had been no other sales. The fact that the stock has been valued for state and Federal tax purposes at $290 per share, or $80,040 for the 276 shares, is particularly significant here in view of (A) (5)-1 section 29.113 (a) (5)-1 (c) of Treasury Regulations 111. This regulation provides, in the case of property acquired by bequest, devise, or inheritance, that the value of the property as of the date of death of the decedent as appraised for the purpose of the Federal estate tax, or if the estate is not subject to such tax, its value for state inheritance or transmission taxes, shall be deemed to be its fair market value at the time of acquisition. A similar regulation under an earlier revenue act has *156 been held to be a proper construction of the statutory basis for determining gain or loss on the sale or other disposition of property. Williams v. Commissioner, 44 Fed. (2d) 467 (C.A. 8, 1930). And in Commissioner v. South Texas Lumber Co., 333 U.S. 496 (1948), the Supreme Court stated that it had "many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporameous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons." In the light of the law, the regulations, and the facts and circumstances of record, we have found the fair market value of the 276 shares of Foundry stock to be $80,040, the value at which it was returned for estate tax purposes. To hold otherwise would ignore a valuation agreed to by the executor of the estate at a time when the selling price was well known to both the respondent and the executor. It is a matter of record that the executor filed the estate tax return more than a year after the sale of the stock. John, as a legatee of Emma's estate, benefited *157 from the compromise agreement reached by respondent and Nicholas, as executor, in fixing the value of the shares, and his present contention for a higher valuation, based on the selling price, is, to say the least, inconsistent with the valuation obtained by his fiduciary for estate tax purposes. We are not persuaded that the selling price on July 30, 1945, was the fair market value of the Foundry stock on August 18, 1944. The final question is the amount of gain realized by petitioners on the sale of their Foundry stock. There would be no difficulty in computing these amounts under the stipulated facts if it were not for the treatment accorded Emma's 276 shares. Emma's will provided that the shares should be divided equally between her living sons and the children of her deceased sons, per stirpes. Such a division was prevented first, by Nicholas' claim that the stock had been given equally to John and him by his mother prior to her death, then by an agreement between Nicholas, John, Elizabeth, Irene, and Craig Mathieu that Nicholas would transfer the 276 shares to Foundry as treasury stock, and finally by Nicholas' failure to carry out the December, 1944, agreement to the extent *158 of the 12 shares held out for himself and a like amount for John. The upshot of Nicholas' manipulations was that he and John received more than one-fourth each of the proceeds from the sale. If Emma's stock had been distributed in accordance with her will, the Foundry stock would have been held as follows: Nicholas - 207 shares (138+69); John - 207 shares (139+69); Elizabeth - 138 shares; Irene - 138 shares; Elizabeth's children - 69 shares; and Irene's children - 69 shares. Upon completion of such a distribution, the stockholdings of each family group would aggregate 207 shares, or one-fourth of Foundry's 828 shares [2]. If Emma's stock had been transferred to Foundry to be held as treasury stock in accordance with the December, 1944, agreement, each family group would also have had one-fourth of the 576 shares outstanding. In that event the children, who were beneficiaries under Emma's will, would have had to look to their mothers *159 for the shares given them by their grandmother. It must be remembered that Elizabeth and Irene understood and agreed, as a part of the December, 1944, agreement, that they would give their children their shares of the proceeds when the stock was sold. Upon the sale of Foundry's capital stock in July, 1945, John discovered for the first time that Nicholas had not complied with the family agreement of December, 1944, and had held out 24 shares from the 276 shares, i.e., 12 for Nicholas and 12 for John. The latter's testimony on the settlement is that the purchaser came with the checks to the stockholders and the necessary papers already made out, and he agreed, after a discussion with the members of the family and their attorneys, "to let it ride as it is so that it wouldn't spoil the sale or hold up the sale if it had to be divided again to the children." John further testified that he stated at that time: "If I have got to take it, I will make it up to you kids." It is clear from the foregoing that John received the proceeds of 150 shares of the 576 shares sold on July 30, 1945. The basis of his original purchase of 138 shares is stipulated to be $6,576.57. The basis of the 12 *160 shares has been determined by respondent to be $1,434.78, upon the theory that John acquired the 12 shares of stock from Emma by gift. Under section 113 (a) (2) of the Code, property acquired by gift takes the donor's basis, which would be $119,56521 per share in view of the stipulation that the basis of Emma's 276 shares was $33,000. Under respondent's theory, therefore, John's basis for determining gain or loss was $8,011.35 ($6,576.57+$1,434.78) with no adjustment being made to his basis for the 252 shares of Emma's stock transferred to Foundry as treasury stock. We cannot agree with respondent that John acquired the 12 shares of stock by gift. In our opinion, as hereinbefore pointed out, the stock passed under the provisions of Emma's will. Thereby, John acquired 69 shares of stock. To settle a dispute with Nicholas, he and his sisters-in-law and a nephew agreed with Nicholas on the disposition of the 276 shares half of which Nicholas claimed as a gift. Admittedly, only one of the grandchildren entitled to take under Emma's will participated in the family agreement, but one must accept the obvious in family discussions and settlements. It is obvious under the facts and circumstances *161 herein that the mothers represented their children in the December, 1944, discussions and the settlement reached. Certainly, there is no evidence in this record that any child objected to the arrangement, or that he or she instituted proceedings to enforce their rights under Emma's will. Then, too, the family arrangement was for the purpose of facilitating the sale of the stock; it was not an attempt to vary the terms of Emma's will. Since the 12 shares of stock came to John under Emma's will and by the family agreement, the stock in his hands has the same basis as other inherited property, i.e., the fair market value at the date of acquisition, or August 18, 1944. This value we have found to be $290 per share as valued for Federal estate tax purposes. Accordingly, John's basis of $6,576.57 should be increased $3,480. The remaining question is whether John and Elizabeth are entitled to increase their bases by adjustments due to the transfer of 252 shares of stock to be held by Foundry as treasury stock. If the terms of Emma's will had been followed, there can be no doubt about the basis of John's stock for gain or loss purposes. That basis would be the stipulated figure for his *162 138 shares, plus the fair market value of the 69 shares inherited from his mother. Sec. 113 of the Code. The situation would be different as to Elizabeth. She had 138 shares in her own right before and after Emma died. Emma's death did not increase her stockholdings in Foundry or the basis of her 138 shares of stock. It is only when you ignore the will that complications arise as to Elizabeth. If she is charged with sales proceeds which belonged to her children and she accepted the amount distributable to them for the purpose of facilitating the sale, then she held such proceeds for her children, not for himself; and the gain on the sale should not be taxed to her individually. In this analysis of the situation, we believe that effect must be given to the underlying intent of the parties rather than to the forms and mechanics adopted to achieve their ultimate goal, sale of Foundry and distribution of the proceeds. Bearing in mind our decision that Emma owned 276 shares of stock when she died, and that the time of acquisition is August 18, 1944, and not December, 1944, when the family attempted, by agreement, to resolve the dispute, we must compute the basis for gain or loss upon *163 the then 828 shares of Foundry stock outstanding. We have found that these shares had a fair market value of $290 per share on August 18, 1944. This per share value should be used in determining the basis of John's 63 shares and the 12 extra shares. Elizabeth's basis should not include the 63 shares belonging to her children. The proceeds from the sale should be divided proportionately between Elizabeth and her children and the stipulated basis for her stock should be used in determining her gain on the sale. The gains so determined for petitioners cannot be reduced to any mathematical formula as in Diebold v. Commissioner, 194 Fed. (2d) 266 (C.A. 3, 1952), for it rests entirely upon the peculiar facts and circumstances of these consolidated cases. Our decision on the disputed issues will result in a reduction of the gain originally reported by petitioners in their returns. The petitioners have alleged overpayments based on their contentions herein. The amounts of such overpayments will be determined under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. Adolph had four children living at the date of Emma's death. Two sons were with the Marine Corps in the South Pacific. one child lived at Dowagiac, Michigan, and one child lived at home. Joseph had three children living when Emma died, one daughter lived in Chicago, and a son and a minor daughter lived at home in Bridgman, Michigan.↩
2. Elizabeth would have held one-sixth of the stock in her own right and her children would have held one-twelfth, which equals one-fourth of the total outstanding stock. Irene and her children would have held their stock in the same proportions.↩